**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CARLA LEE TUTTLE, | CASE NO. 1:24-CV-01188 |
| Plaintiff, | |
| vs. | JUDGE JOHN R. ADAMS |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Carla Lee Tuttle ("Plaintiff" or "Ms. Tuttle") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.       Procedural History

Ms. Tuttle filed her DIB application on January 6, 2022, alleging disability beginning April 1, 2015.  (Tr. 17, 139-45.)  She alleged disability due to polyneuropathy, Marfan Syndrome, sacrococcygeal disorder, axonal sensorimotor polyneuropathy, osteoarthritis multiple joints, lumbago with sciatica, tenosynovitis, heart condition, anxiety, hearing aids, and ankle

1

braces.  (Tr. 57, 66, 164, 191.)  Her application was denied at the initial level (Tr. 76-80) and

upon reconsideration (Tr. 82-86).  She then requested a hearing.  (Tr. 87-88.)

On August 23, 2023, a telephonic hearing was held before an Administrative Law Judge

("ALJ").  (Tr. 32-56.)  The ALJ issued an unfavorable decision on October 9, 2023, finding Ms.

Tuttle had not been under a disability from April 1, 2015, the alleged onset date, through

September 30, 2020, the date last insured.  (Tr. 14-31.)  Plaintiff requested review of the decision

by the Appeals Council.  (Tr. 135-38.)  The Appeals Council denied her request for review on

May 16, 2024, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

Plaintiff filed the pending appeal on July 15, 2024 (ECF Doc. 1), and the matter is fully briefed

(ECF Docs. 9, 12, 13).

## II.      Evidence

## A.      Personal, Educational, and Vocational Evidence

Ms. Tuttle was born in 1971.  (Tr. 25, 139.)  She was 48 years old as of her date last

insured.  (Tr. 25.)  She has a high school education and three years of echo tech training.  (Tr. 25,

40, 165.)  She last worked in 2015 as an echo tech, performing ultrasounds. (Tr. 38, 40.)

## B.      Medical Evidence

### 1.      Relevant Treatment History[1]

#### i.      Records Between the Alleged Onset Date and Date Last Insured

Ms. Tuttle treated with her primary care provider Adam J. Bihl, M.D., at Avita Health

System, throughout the relevant period.  When she saw Dr. Bihl on March 7, 2016, for a well

---

[1] Ms. Tuttle alleges disability due to physical and mental impairments (Tr. 57, 66, 164, 191) and her "Statement of Issues" heading mentions a challenge to the mental RFC (ECF Doc. 9, pp. 1, 9), but she does not develop any arguments relating to her mental impairments.  Accordingly, the medical evidence summarized herein is focused on her physical impairments, and any arguments relating to her mental impairments is deemed waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original).

visit, one of her diagnoses was polyneuropathy, unspecified.  (Tr. 265.)  Her physical examination findings were normal.  (Tr. 267.)  Her medications included gabapentin and meloxicam.  (Tr. 268.)  On September 29, 2016, Ms. Tuttle returned to Dr. Bihl for an office visit relating to her neuropathy.  (Tr. 260.)  Examination findings were normal.  (Tr. 262.)

On April 17, 2017, Ms. Tuttle presented to Kevin McGarvey, D.P.M., for complaints of bilateral neuropathy and deformed toes, with a chief complaint of bilateral pain in the second toe. (Tr. 270.)  She reported that walking aggravated her pain.  (*Id*.)  She also reported having Marfan's disease, taking gabapentin and Mobic for neuropathy, and wearing orthotics daily. (*Id*.)  She asked whether getting a new set of orthotics would help her neuropathy.  (*Id*.)  Her pulses were 2/4 bilaterally and she had diminished sensations bilaterally with Semmes-Weinstein monofilament (SWMF) test and a history of nerve pain.  (*Id*.)  Dr. McGarvey did not recommend new orthotics or surgery, noting that Ms. Tuttle's neuropathy and toe deformities could not be corrected or changed with orthotics.  (*Id*.)

Ms. Tuttle returned to Dr. Bihl for follow up on neuropathy and primary osteoarthritis involving multiple joints on May 10, 2017; examination findings were unremarkable.  (Tr. 381.)

On June 14, 2017, Lindsey Wolf, CNP, at Avita Ontario Family Medicine treated Plaintiff for left hip pain.  (Tr. 379-80.)  Ms. Tuttle reported that she "bent down and felt a ripping sensation."  (Tr. 379.)  She rated her pain as 6/7 at rest but 10/10 when walking. (*Id*.) She said her pain radiated down her left leg with a burning sensation.  (*Id*.)  She also complained of back pain on the lower-left side, spasms, and a history of right hip pain.  (*Id*.)  She said she tried muscle relaxers and ice with mild relief.  (*Id*.)  On examination, Ms. Tuttle's reflexes were decreased on the left side.  (Tr. 380.)  CNP Wolf noted pain with palpation near her left hip, lower back, and S1 and S2 vertebrae.  (*Id*.)  Her range of motion could not be assessed because

she was unable to rotate her hip or leg.  (*Id*.)  CNP Wolf assessed left hip and back pain, likely related to sciatic nerve impingement.  (*Id*.)  She started Ms. Tuttle on prednisone to reduce inflammation and also started her on a muscle relaxer.  (*Id*.)

On September 29, 2017, Ms. Tuttle returned to Dr. Bihl.  (Tr. 376.)  She complained of right elbow pain starting the month prior, after "cutting a lot of wood."  (*Id*.)  She also reported bruising easily with no known reason and requested neuropathy medication refills.  (*Id*.)  She had tried taking Mobic and was using a brace for her tendonitis.  (*Id*.)  Examination findings were generally unremarkable, except Dr. Bihl noted that her lateral epicondyle was tender and there was pain with resisted supination and extension at the wrist.  (Tr. 377.)  Ms. Tuttle's diagnoses included: neuropathy; primary osteoarthritis; abnormal bruising; lateral epicondylitis, unspecified laterality; and sciatic nerve pain on the left.  (*Id*.)  Dr. Bihl continued Ms. Tuttle's prescriptions for 300 mg gabapentin twice a day for neuropathy and 15 mg meloxicam once a day for primary osteoarthritis involving multiple joints.  (*Id*.)  He advised Ms. Tuttle to use rest, ice, compression, and elevation (RICE) and a forearm strap for her elbow.  (*Id*.)

On March 29, 2018, Ms. Tuttle saw Dr. Bihl for shortness of breath starting two months earlier.  (Tr. 368.)  She also presented for follow up regarding her arthritis, indicating that her symptoms were well controlled.  (*Id*.)  Examination findings were unremarkable.  (Tr. 369.)  Her diagnoses included neuropathy, for which she was prescribed 300 mg gabapentin twice a day, and primary osteoarthritis, for which she was prescribed 15 mg meloxicam once a day.  (*Id*.)

On April 9, 2018, Ms. Tuttle returned to podiatrist Dr. McGarvey, complaining of a chronic ingrown nail on her left second toe that underwent temporary nail correction and healed well.  (Tr. 271.)  She reported having pain to her forefoot with weightbearing.  (*Id*.)  She was able to heel and toe walk with ease and rise from a seated position unassisted.  (*Id*.)  Dr.

4

McGarvey surgically removed the entire nail.  (*Id*.)  When she returned to Dr. McGarvey for follow up on April 23, 2018, she reported no pain to the forefoot with weightbearing and she was doing well postoperatively.  (Tr. 272.)

On August 24, 2018, Ms. Tuttle presented to Kelly Y. Osborne, PA-C, at the Avita Ontario Emergency Department, complaining of a flare up of low back pain radiating into the right buttock and right leg.  (Tr. 642.)  She had been doing a lot around the house, which she thought might have caused the flare up.  (*Id*.)  She was able to ambulate, had no weakness in her extremities, and had no numbness or tingling in her legs.  (*Id*.)  On examination, PA Osborne noted decreased range of motion, tenderness, and pain in the lower back.  (Tr. 645.)  Her straight leg raise test and gait were normal.  (*Id*.)  She was treated with medication for symptomatic relief and referred to Dr. David Fitch for physical medicine and rehabilitation.  (Tr. 642, 647-48.)

On October 4, 2018, Ms. Tuttle followed up with David S. Fitch, D.O., at Avita Spine & Physical Medicine and Rehabilitation regarding a back pain flare that had caused her to seek emergency treatment in August.  (Tr. 636.)  She reported that her back pain was aggravated by sitting, lifting, and standing.  (*Id*.)  She also reported numbness and tingling.  (*Id*.)  Her examination showed 2+ reflexes and 5/5 strength in the bilateral lower extremities.  (Tr. 636-37.) Dr. Fitch noted diminished sensation to light touch in the bilateral feet in a stocking pattern consistent with Ms. Tuttle's history of neuropathy.  (Tr. 637.)  Her plantar responses were "downgoing."  (*Id*.)  Her straight leg raise and Spurling tests were negative.  (*Id*.)  Hip and SI joint provocative tests were mildly positive on the right.  (*Id*.)  Ms. Tuttle reported feeling a lot better since her recent exacerbation; she felt she was back to her baseline.  (*Id*.)  Dr. Fitch recommended a lumbar spine x-ray due to her on-and-off back pain for ten years.  (*Id*.)  He also raised the possibility of physical therapy, but Ms. Tuttle felt she was back to baseline and did not

need physical therapy.  (*Id*.)  Dr. Fitch recommended home exercises as tolerated, discussed over-the-counter medications, including Acetaminophen and NSAIDs, and noted that she was taking gabapentin for her neuropathy.  (*Id*.)  He refilled her prescription for Flexeril.  (*Id*.)

On November 12, 2018, Ms. Tuttle returned to Dr. Bihl for follow up.  (Tr. 355.)  She reported that her arthritis symptoms were well controlled, she had no medication side effects, and she did not need any refills.  (*Id*.)  She had stopped taking meloxicam because it was not helping. (*Id*.)  She continued to report neuropathy-related pain in her feet and reported that she had been taking extra neuropathy medication at bedtime three to four times a week due to increased neuropathic pain at night.  (*Id*.)  Examination findings were unremarkable.  (Tr. 357.)  Dr. Bihl increased Ms. Tuttle's gabapentin to 300 mg three times a day.  (*Id*.)

Ms. Tuttle returned to Dr. Fitch for follow up on December 26, 2018.  (Tr. 622.)  She continued to report some right-sided low back pain, but without radiation down her leg.  (*Id*.) She continued to have numbness in her feet but said it was not new, noting that she had numbness in her feet for about four years.  (*Id*.)  On examination, her lower extremity strength was within functional limits and she was able to heel/toe walk.  (*Id*.)  Dr. Fitch noted that Ms. Tuttle's lumbar spine x-rays from October 4, 2018, showed well-preserved vertebral body heights and disc spaces, minimal scoliosis convex to the right, SI joint spaces were patent, hip joint spaces were well preserved, and there were no significant facet joint degenerative changes appreciated.  (*Id*.; *see also* Tr. 635, 640.)  Dr. Fitch concluded that Ms. Tuttle was mostly recovered from her recent right SI joint pain exacerbation and there were no signs or symptoms of lumbosacral radiculopathy.  (Tr. 623.)  He indicated that her chronic bilateral foot numbness had an uncertain etiology.  (*Id*.)  He refilled Ms. Tuttle's Flexeril and noted that a prednisone burst and Acetaminophen had helped her the prior week.  (*Id*.)  He also noted that Ms. Tuttle

6

continued to take gabapentin for her chronic foot paresthesia.  (*Id.*)  He recommended home exercises for her low back and referred her to neurology for a determination of the etiology and appropriate treatment for her chronic bilateral foot numbness.  (*Id.*)

Ms. Tuttle returned to Dr. Bihl on May 8, 2019.  (Tr. 347.)  She requested a refill of the muscle relaxer that Dr. Fitch had prescribed, indicating she was taking it daily at most and that it worked well with no side effects.  (*Id.*)  She reported that her arthritis symptoms were well controlled.  (*Id.*)  She continued to report neuropathy-related pain in her feet.  (*Id.*)  Examination findings were unremarkable.  (Tr. 348.)  Dr. Bihl prescribed 300 mg gabapentin to be taken once in the morning, once at mid-day, and twice at bedtime.  (*Id.*)  He also prescribed cyclobenzaprine for muscle spasms, to be taken three times daily as needed.  (*Id.*)

Ms. Tuttle returned to Dr. Bihl on November 5, 2019.  (Tr. 342.)  She reported a flare up in her joints and noted that her sister had been diagnosed with rheumatoid arthritis.  (*Id.*)  She continued to report neuropathic pain in her feet.  (*Id.*)  She also reported that sacroiliac joint pain caused her back to go out and caused her hip pain.  (*Id.*)  Taking muscle relaxers as needed for her sacroiliac joint pain helped.  (*Id.*)  She also reported knee pain, for which she took Tylenol as needed.  (*Id.*)  Examination findings were unremarkable.  (Tr. 343.)  Dr. Bihl continued Ms. Tuttle's prescriptions for gabapentin and cyclobenzaprine.  (Tr. 343-44.)

On May 27, 2020, Ms. Tuttle presented to Dr. Bihl for follow up.  (Tr. 322.)  She reported her arthritis symptoms were well controlled.  (*Id.*)  She continued to report neuropathy related pain and sacroiliac joint pain, but said muscle relaxers helped with her sacroiliac joint pain.  (*Id.*)  Vitamin B12 deficiency was noted, but Ms. Tuttle reported improvement in her fatigue.  (*Id.*)  She requested a referral to podiatry because she was in need of new inserts.  (Tr. 323.)  Examination findings were unremarkable.  (Tr. 324.)  Dr. Bihl continued to prescribe

gabapentin for neuropathy and cyclobenzaprine for sciatic nerve pain / muscle spasms, and referred Ms. Tuttle to podiatry for her foot pain.  (Tr. 324-25.)

On June 2, 2020, Ms. Tuttle presented to Michael G. Swiatek, DPM, at Avita Galion Foot & Ankle Specialist for evaluation and treatment of neuropathic pain and painful digital nail formations.  (Tr. 588.)  She reported not knowing if her neuropathy was related to her Marfan Syndrome.  (*Id*.)  She also reported sciatic issues, but said the neuropathy started before those issues.  (*Id*.)  She was taking her gabapentin as needed, rather than as scheduled, but noted that she was going to try to take it as scheduled.  (*Id*.)  She said her neuropathy was progressing from her feet to her ankles, and that her neuropathy-related pain was worse at night.  (*Id*.)  She also reported numbness.  (Tr. 589.)  She said her orthotics were about three years old and broken down and she was interested in a new pair.  (Tr. 588.)  On examination, Dr. Swiatek noted decreased sharp/dull sensation bilaterally to the level of the ankle and diminished protective sensations with a SWMF test to the level of the ankle.  (Tr. 590.)  He noted mild pain to the heels bilaterally at the insertion of the plantar fascia.  (*Id*.)  Muscle strength in the bilateral lower extremities was 5/5 and there was appropriate muscle tone and symmetry.  (*Id*.)  Dr. Swiatek referred Ms. Tuttle to neurology for evaluation of her neuropathy and provided a prescription for custom orthotics for her foot pain, neuropathy, and plantar fasciitis.  (*Id*.)

On June 11, 2020, Ms. Tuttle presented to Kim E. Brown, P.T., at Avita Health Physical Therapy for an ankle / foot orthotics evaluation.  (Tr. 276.)  She reported wearing orthotics for five years for neuropathy and plantar fasciitis bilaterally.  (*Id*.)  She felt better when wearing her orthotics, but said her current pair was torn up.  (*Id*.)  She described morning soreness until she warmed up, and said her neuropathy symptoms were worse at night.  (*Id*.)  She reported her current pain level was a 2/10, with her pain ranging from 1-9/10.  (*Id*.)  She was independent

with her activities of daily living, and she regularly gardened.  (Tr. 277.)  But she reported diminished ability to ambulate and difficulty performing her prior level of exercise, travel, and/or recreational activities.  (*Id*.)  On examination, Ms. Tuttle's range of motion was abnormal for rearfoot inversion and forefoot inversion.  (Tr. 278.)  She had excessive forefoot mobility and abnormal plantar fascia testing.  (*Id*.)  PT Brown recommended that Ms. Tuttle be fitted for custom orthotics (Tr. 280), and she was fitted on July 10, 2020 (Tr. 275).

On August 3, 2020, Ms. Tuttle presented to Robert T. Woodruff, M.D., at AVI ONT Neurology, for evaluation of her neuropathy.  (Tr. 572.)  She reported an eight-year history of progressive polyneuropathy and a diagnosis of Marfan Syndrome at age twelve.  (*Id*.)  She reported numbness, paresthesia, and burning in her feet since 2012, which moved into her lower limbs over time.  (*Id*.)  She said her symptoms were worse at night, with prolonged standing and walking, or when standing on concrete.  (*Id*.)  Her feet felt better when she wore shoes, as opposed to being barefoot.  (*Id*.)  She reported taking 300 mg gabapentin in the morning and afternoon and 600 mg in the evening, but said the medication was not helping like it had in the past.  (*Id*.)  Her physical examination revealed long feet with mild to moderately high arches, sensory deficit, decreased Achilles reflexes, and loss of pinprick eight inches above the ankle.  (Tr. 576.)  Her extensor digitorum brevis muscles (EDBs) were atrophic, and she could not wiggle her toes.  (*Id*.)  Her coordination was intact, her gait was normal, and she could heel and toe walk, but she had difficulty tandem walking.  (*Id*.)  Ms. Tuttle was diagnosed with sensory polyneuropathy and neuropathic pain due to polyneuropathy.  (Tr. 578.)  Dr. Woodruff suspected that Ms. Tuttle's neuropathy was related to connective tissue disease (Marfan Syndrome).  (*Id*.)  He recommended an EMG of the lower limbs.  (*Id*.)  He also recommended that she slowly increase the gabapentin to 600 mg three times a day.  (*Id*.)  Ms. Tuttle's August 13, 2020 EMG

9

and nerve conduction study of the lower extremities was abnormal and revealed "a severe, symmetric, length-dependent, axonal, sensorimotor polyneuropathy."  (Tr. 546-51.)

On September 2, 2020, Ms. Tuttle returned to see podiatrist Dr. Swiatek.  (Tr. 538.)  As to her neuropathic pain, she reported doing well with a topical cream and said her neurologist had increased her gabapentin; her new orthotics were also helping.  (*Id*.)  Her review of systems was positive for numbness and tingling in her feet.  (Tr. 539.)  On physical examination, Dr. Swiatek noted decreased sharp/dull sensation bilaterally to the level of the ankle and diminished protective sensations with SWMF to the level of the ankle.  (*Id*.)  But he also noted normal sensation to light touch and normal muscle mass in the lower extremity and foot bilaterally.  (Tr. 539-40.)  Ms. Tuttle was able to heel and toe walk and rise from a seated position unassisted.  (Tr. 540.)  She had normal muscle strength and appropriate muscle tone in the lower legs, ankles, and feet.  (Tr. 540.)  Dr. Swiatek recommended that she continue the topical cream for neuropathy and wear her orthotics for her foot pain, neuropathy, and plantar fasciitis.  (*Id*.)

### ii.    Records After the Date Last Insured

On November 2, 2020. Ms. Tuttle returned to Dr. Woodruff for evaluation and management of axonal polyneuropathy, after seeing him three months earlier in August.  (Tr. 532.)  She reported that the increase dosage of gabapentin helped but she was still having pain in her feet.  (*Id*.)  She also reported intermittent low back pain for which she took Flexeril at bedtime.  (*Id*.)  She complained of not being able to perform as much physical work as she had in the past.  (*Id*.)  On examination, Dr. Woodruff noted motor weakness (4/5 DF weakness bilaterally) and an antalgic gait pattern.  (Tr. 536.)  Ms. Tuttle's diagnosis was polyneuropathy in Marfan Syndrome.  (Tr. 537.)  Dr. Woodruff recommended adding 30 mg Cymbalta daily for

neuropathic pain.  (*Id*.)  Ms. Tuttle stated she would discuss it with her daughter who was a nurse.  (*Id*.)  Dr. Woodruff advised Ms. Tuttle to follow up in Spring 2021.  (*Id*.)

On November 23, 2020, Ms. Tuttle followed up with Dr. Bihl.  (Tr. 529-31.)  She continued to report well-controlled arthritic symptoms, with bilateral neuropathic pain in the feet and sacroiliac joint pain.  (Tr. 529.)  Examination findings were unremarkable.  (Tr. 530.)

Ms. Tuttle returned to Dr. Swiatek on December 9, 2020.  (Tr. 525.)  She reported that her neuropathic pain she was doing well with the pain cream, but she needed a refill.  (*Id*.)  She said that her orthotics were "really helping."  (*Id*.)  Review of systems was positive for numbness and tingling in the feet.  (Tr. 526.)  On examination, Dr. Swiatek noted decreased sharp/dull sensation bilateral to the level of the ankle.  (Tr. 527.)  Protective sensations were diminished with SWMF to the level of the ankle.  (*Id*.)  There was normal sensation to light touch bilaterally and normal muscle mass, tone, and strength in the lower extremities, and Ms. Tuttle was able to heel and toe walk with ease and rise from a seated position unassisted.  (*Id*.)  Dr. Swiatek provided a neuropathy cream refill and encouraged Ms. Tuttle to wear her orthotics daily.  (*Id*.)

On March 12, 2021, Ms. Tuttle saw Dr. Bihl for an acute sick visit for congestion that was conducted via video due to the pandemic.  (Tr. 523-24.)

Ms. Tuttle returned to Dr. Woodruff on April 29, 2021.  (Tr. 291.)  She was taking 300 mg gabapentin three times daily and had added 30 mg Cymbalta once daily, but she reported that she was still in "quite a bit of pain."  (*Id*.)  She described a "ripping or tearing like pain in her calves."  (*Id*.)  On examination, Ms. Tuttle's gait and station were normal, with normal muscle strength and tone in all extremities.  (Tr. 293.)  She was able to walk easily, and she could do tandem gait, walk on her heels, and walk on her toes.  (*Id*.)  Reflexes were 2+ in the upper limbs and knees but absent at the ankles.  (*Id*.)  Ms. Tuttle's diagnosis was Marfan Syndrome with

painful, sensory polyneuropathy.  (*Id*.)  Although Ms. Tuttle expressed concern that her neuropathy was rapidly advancing, Dr. Woodruff indicated he was not seeing "significant clinical worsening"; due to reported increased pain, he increased Cymbalta to 60 mg daily.  (*Id*.)

On July 20, 2021, Ms. Tuttle returned to Dr. Woodruff for follow up.  (Tr. 288.)  She reported that the increase in Cymbalta helped with her discomfort and pain in her feet and lower legs, but she was still having trouble in the early evenings.  (*Id*.)  She also reported more fatigue and less stamina when walking, and she reported using a cane on occasion.  (*Id*.)  On examination, her muscle strength and tone in all extremities was normal.  (Tr. 290.)  She walked "slowly and slightly with an unsteady pattern."  (*Id*.)  Her diagnosis was idiopathic progressive polyneuropathy.  (*Id*.)  Dr. Woodruff increased Ms. Tuttle's gabapentin to 600 mg four times a day and discussed adding 30 mg of Cymbalta in the evening if the gabapentin did not help her early evening pain.  (*Id*.)  At Ms. Tuttle's request, Dr. Woodruff wrote Ms. Tuttle a handicap prescription.  (*Id*.)

On August 12, 2021, Ms. Tuttle saw Dr. Bihl for a video visit due to left ankle pain.  (Tr. 511.)  She was not certain of the cause of the injury, but she noted that her ankle gave out at times due to her neuropathy.  (*Id*.)  X-rays of the left ankle were ordered.  (Tr. 512.)

On September 9, 2021, Ms. Tuttle presented to Dr. Swiatek regarding pain in her right ankle.  (Tr. 505.)  She described her pain as sharp and sometimes pulling with swelling.  (*Id*.)  She said that "sitting and resting [did] seem to help and that walking/activity increase[d] the pain."  (*Id*.)  She also reported sleep disturbance due to her pain.  (Tr. 506.)  She said Dr. Bihl had ordered an x-ray and prescribed prednisone for the issue.[2]  (Tr. 505.)  On examination, Ms.

---

[2] The records from Ms. Tuttle's August 2021 visit with Dr. Bihl show she reported an injury to her left ankle.  (Tr. 511.)  During her September 2021 visit with Dr. Swiatek, she complained of right ankle pain, with reports of right ankle x-rays from August 2021.  (Tr. 507.)  Thus, it is not clear whether there were two separate injuries or whether the notations to the left ankle in the August 2021 record was incorrect and the injury was to the right ankle.

Tuttle's gross and light sensations were intact in her lower extremities, with normal muscle mass in the lower extremities and feet.  (Tr. 507.)  Dr. Swiatek noted pain to palpation of the medial aspect of the right ankle in the area of the posterior tibial tendon, with positive pain with ankle joint dorsiflexion, eversion, and inversion eversion.  (*Id.*)  No pain was noted in the area of the insertion of the ATFL ankle ligaments.  (*Id.*)  No pain was noted on palpation to the base of the 5th metatarsal and posterior tibial tendon strength was graded at 4/5.  (*Id.*)  Ms. Tuttle was diagnosed with posterior tibial tendinitis of the right lower extremity and right foot pain.  (*Id.*)  She was prescribed diclofenac and a brace to be worn for four to eight weeks, and she was advised to rest and elevate her foot while icing the affected area.  (Tr. 507-08.)

On November 9, 2021, Ms. Tuttle returned to Dr. Woodruff for follow up.  (Tr. 284.)  She reported that increasing her medication to 600 mg of gabapentin four times a day and to 60 mg of Cymbalta in the morning and 30 mg of Cymbalta in the evening "really helped the discomfort in her feet."  (*Id.*)  However, she had recently suffered a partial tendon tear in her plantar flexors her right ankle and was scheduled for surgery in about a month.  (*Id.*)  On examination, Ms. Tuttle had difficulty ambulating due to a walking boot and poor balance.  (Tr. 286.)  Dr. Woodruff's impression was that Ms. Tuttle's condition— idiopathic progressive polyneuropathy—was stable on the aggressive symptomatic plan of 600 mg gabapentin four times a day, 60 mg Cymbalta daily, and 30 mg Cymbalta in the evening.  (Tr. 287.)  He recommended follow up in six months or as needed.  (*Id.*)

On November 22, 2021, Ms. Tuttle saw Dr. Bihl for a preoperative evaluation.  (Tr. 483.)  She was cleared for right ankle surgery.  (Tr. 487.)  On December 10, 2021, Ms. Tuttle underwent right ankle surgery.  (Tr. 457-69.)  Following surgery, she was instructed to keep her foot elevated while sitting or sleeping with no weight bearing for three weeks.  (Tr. 457.)

13

On May 6, 2022, Ms. Tuttle saw Dr. Bihl.  (Tr. 893-97.)  She continued to complain of neuropathic pain in her feet and sacroiliac joint pain.  (Tr. 894-95.)  She also complained of palpitations that had been occurring once or twice a month at random times without activity for about a year.  (Tr. 894.)  Examination findings were unremarkable.  (Tr. 896.)

On October 21, 2022, Ms. Tuttle returned to Dr. Bihl.  (Tr. 801.)  She continued to report neuropathic pain in her feet.  (*Id*.)  She also reported edema in her right foot due to her surgery.  (*Id*.)  She reported pain in her left thumb that had been ongoing for months and palpitations that started the other day.  (Tr. 802.)  She said she felt "out of rhythm" and "dizzy" since the palpitations started.  (*Id*.)  Examination findings were unremarkable.  (Tr. 804.)  Dr. Bihl recommended a Holter monitor.  (Tr. 805.)  The impression from the 12-day Holter monitor was unremarkable, "with only 2 episodes of 3–5 beat PAT one of which symptomatic. Other two symptoms occurred during sinus rhythm.  Rare PAC, PVC."  (Tr. 775.)

When Ms. Tuttle saw Dr. Bihl on April 21, 2023, she presented with complaints of pain in her feet and sacroiliac joints that were similar to prior reports of pain.  (Tr. 722-23.)  Examination findings were unremarkable.  (Tr. 724.)

## 2.    Opinion Evidence

### i.    Treating Source

On August 3, 2023, Adam Bihl, M.D., of Avita Ontario Family Practice provided a letter, stating:

> Carla Tuttle is a patient of mine and was under my care for her neuropathy from 2015 to 2020.  Please take in to consideration the following recommendations: Rest and elevate feet waist level or higher for swelling and pain.  Please contact the office. . . for any further questions.

(Tr. 1848.)

14

### ii.    State Agency Medical Consultants

On April 19, 2022, state agency medical consultant, Linda Hall, M.D., completed a Physical RFC Assessment, opining that Ms. Tuttle could: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of 4 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; occasionally operate foot controls with BLE (bilateral lower extremities); never climb ladders, ropes, or scaffolds; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and avoid all exposure to hazards. (Tr. 61-62.)  Dr. Hall explained the exertional limitations of 4 hours standing and walking in an 8-hour day and occasional BLE foot controls were "[d]ue to documented severe, symmetric, length-dependent, axonal, polyneuropathy on EMG, w/ 4/5 DF weakness, decreased BLE sensation, and antalgic gait pattern and neck, back, and hip pain." (Tr. 61.)  Dr. Hall explained the postural limitations were "[d]ue to neck, back, and joint pain and documented peripheral neuropathy w/ decreased BLE sensation, mild 4/5 DF, and antalgic gait." (Tr. 62.)  With respect to the environmental limitation that Ms. Tuttle avoid all exposure to hazards, Dr. Hall explained that Ms. Tuttle could have no exposure to "hazardous heights" and could not "operat[e] hazardous machinery requiring use of foot controls due to peripheral neuropathy." (*Id.*)

State agency medical consultant Elizabeth Das, M.D., agreed with Dr. Hall's Physical RFC Assessment on reconsideration on September 12, 2022. (Tr. 69-71.)

### C.    Hearing Testimony

### 1.    Plaintiff's Testimony

Ms. Tuttle testified in response to questioning by the ALJ and her counsel at the hearing on August 23, 2023. (Tr. 38-51.)  The ALJ and Ms. Tuttle's counsel reminded Ms. Tuttle that

the period of time that she should focus on during her testimony was between April 1, 2015, and September 30, 2020.  (Tr. 41, 43.)

Ms. Tuttle reported that she stopped working in April 2015 because she was having a lot of pain during the workday, she was not able to anything once she was home, and she was missing a lot of work due to pain in her feet and legs.  (Tr. 42.)  She said she "just got to the point where [she] just couldn't do it anymore."  (*Id*.)  She was hoping that her pain would get better, but she did not initially realize there was no "cure for [her neuropathy diagnosis]," because it "just progresses" and "doesn't get better."  (*Id*.)

Ms. Tuttle testified that she was prescribed gabapentin and Cymbalta for neuropathy in her lower extremities.  (Tr. 42.)  As far as other treatment modalities, she said she had to elevate her legs several times a day; if she did not do so she would "pretty much [be] down for at least three days and [could not] do anything really."  (*Id*.)  She said there really was no other treatment to help with the neuropathy and associated pain.  (*Id*.)  She had to have one surgery to repair a torn tendon in her right ankle that occurred when she tripped due to drop foot from her neuropathy.  (Tr. 43.)  In addition to neuropathy, Ms. Tuttle said she also had Marfan syndrome, which was a connective tissue disorder that affected her whole body.  (Tr. 44-45.)  At times, the condition caused her lower back to go out.  (Tr. 44.)  When that happened, she would usually be down for at least a week, and she would have to take pain medication or receive shots and usually ended up in the emergency room.  (*Id*.)

Ms. Tuttle reported having numbness and burning in her feet since 2012, which had gradually worsened and moved into her legs.  (Tr. 45.)  Since September 2020, she said her neuropathy-related pain increased drastically, noting that her most recent EMG showed her neuropathy was up to her knees.  (*Id*.)  She said her gabapentin dose was previously 600 mg but

16

it had been increased to the maximum of 2400 mg.  (Tr. 45-46.)  Prior to September 2020, she said medication side effects included tiredness and drowsiness, which affected her ability to recall things at times.  (Tr. 46.)  She said she could stand or walk for about thirty minutes before needing to elevate her feet to waist level or higher for thirty minutes.  (Tr. 44, 47-48.)  She also reported difficulty sitting for longer than thirty minutes without elevating her legs because it caused pain.  (Tr. 47, 48.)  Even when her feet were elevated, she said it did not take her pain away; it just relieved it.  (Tr. 47.)  She estimated elevating her feet five to six times during the day for thirty minutes to two hours at a time.  (Tr. 49-50.)  She was able to drive, but had someone else drive her if she had to drive for "long periods" like an hour.  (Tr. 48-49.)  She estimated being able to lift about twenty-five to thirty pounds.  (Tr. 49.)

### 2.       Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  (Tr. 51-55.)  The VE testified that Ms. Tuttle's past relevant work as an ultrasound technician was a skilled, light exertional position, performed by Ms. Tuttle at the medium exertional level.  (Tr. 52.)

In response to the ALJ's second hypothetical, the VE testified that a hypothetical individual of Ms. Tuttle's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination (Tr. 20, 53, 54), could perform sedentary positions in the national economy such as: order clerk, electronic inspector, and charge account clerk.  (Tr. 53-54.)  For her third hypothetical, the ALJ asked the VE to assume the same limitations as the second hypothetical with the following additional limitations: the individual would be able to understand, remember, and carry out only simple instructions; the individual could have occasional interaction with the public, coworkers, and supervisors; and the individual would need to have the ability to elevate her feet to waist level throughout the day or while in position.

17

(Tr. 54.)  The VE testified that there would be no competitive work available for such an individual.  (Tr. 54-55.)  The VE also testified that the tolerance for off task behavior was no more than ten percent of loss production and no more than two absences per month.  (Tr. 55.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.      The ALJ's Decision

In her October 9, 2023, decision, the ALJ made the following findings:[3]

1.      The claimant last met the insured status requirements of the Social Security Act on September 30, 2020.  (Tr. 19.)

2.      The claimant did not engage in substantial gainful activity during the period from her alleged onset date of April 1, 2015, through her date last insured of September 30, 2020.  (*Id.*)

3.      The claimant had the following severe impairments through the date last insured: peripheral neuropathy, Marfan syndrome, osteoarthritis, and plantar fasciitis.  (Tr. 19.)  The claimant also had non-severe impairments physical impairments; there were no medically determinable mental health impairments.  (Tr. 19-20.)

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20.)

5.      Through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can occasionally operate foot controls with the bilateral lower extremities; can never climb ladders, ramps, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop,

---

[3] The ALJ's findings are summarized.

19

kneel, crouch, and crawl; must avoid exposure to all hazards, including unprotected heights, dangerous machinery, and machinery requiring use of foot controls in general.  (Tr. 20-25.)

6.  Through the date last insured, the claimant was unable to perform any past relevant work.  (Tr. 25.)

7.  The claimant was born in 1971, and was 48 years old, defined as a younger individual age 18-44, on the date last insured, and she subsequently changed age category to a younger individual age 45-49.  (*Id*.)

8.  The claimant has at least a high school education.  (*Id*.)

9.  Transferability of job skills is not material to the determination of disability.  (*Id*.)

10.  Through the date last insured, considering claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed, including order clerk, electronic inspector, and charge account clerk.  (Tr. 25-26.)

Based on the foregoing, the ALJ found Ms. Tuttle was not under a disability from April 1, 2015, the alleged onset date, through September 30, 2020.  (Tr. 26.)

## V.    Plaintiff's Arguments

Ms. Tuttle presents three arguments in her sole assignment of error.  (ECF Doc. 9, pp. 9-23; ECF Doc. 13.)  First, she argues the ALJ erred in evaluating Dr. Bihl's opinion.  (ECF Doc. 9, pp. 12-17; ECF Doc. 13, pp. 1-4.)  Second, she argues the ALJ erred in evaluating her subjective allegations.  (ECF Doc. 9, pp. 17-22; ECF Doc. 13, pp. 4-6.)  Third, she argues the RFC is not supported by substantial evidence.  (ECF Doc. 9, pp. 22-23; ECF Doc. 13, p. 6.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives

21

the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: The ALJ Properly Evaluated the Medical Opinions, Subjective Allegations, and RFC Limitations**

In her sole assignment of error, Ms. Tuttle argues the ALJ: failed to properly evaluate Dr. Bihl's opinion (ECF Doc. 9, pp. 12-17; ECF Doc. 13, pp. 1-4); failed to properly evaluate her subjective allegations (ECF Doc. 9, pp. 17-22; ECF Doc. 13, pp. 4-6); and assessed an RFC that is not supported by substantial evidence (ECF Doc. 9, pp. 22-23; ECF Doc. 13, p. 6). All three arguments center around an assertion that ALJ should have adopted an RFC allowing for Ms. Tuttle to elevate her legs throughout the day. Each argument is addressed in turn below.

**1.      The ALJ Properly Evaluated Dr. Bihl's Opinion**

Ms. Tuttle argues that the ALJ "failed to apply the consistency and supportability factors to the opinion of long-term treating physician, Adam J. Bihl, M.D.," as the regulations require. (ECF Doc. 9, p. 9.) The Commissioner responds that the ALJ "reasonably discounted Dr. Bihl's opinion because it lacked both supportability and consistency." (ECF Doc. 12, pp. 5-6.)

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation. 20 C.F.R. § 404.1520c(a). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 404.1520c(c)(1)-(5). The most important factors

22

are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

The ALJ analyzed the persuasiveness of Dr. Bihl's medical opinion as follows:

> In correspondence dated August 3, 2023, Adam Bihl, M.D., noted that the claimant has been under his care for her neuropathy from 2015 through 2020 and that he recommended rest and elevating feet to waist level or higher for swelling and pain []. The undersigned has found this assessment <u>unpersuasive.</u> <u>There is no objective evidence cited by Dr. Bihl to support the extent of the limitations assessed. Furthermore, review of the record above does not establish foundation for or medical support for either of Dr. Bihl's allowances</u>.

(Tr. 24-25 (emphasis added) (internal citation omitted).)

Ms. Tuttle argues first that the ALJ inadequately addressed the "supportability" of Dr. Bihl's opinion—i.e., the extent to which Dr. Bihl's own objective findings and supporting

23

explanations substantiate or support the findings in his opinion—because the ALJ: (1) "failed to provide any explanation as to why" Dr. Bihl's supporting explanations were insufficient; and (2) "failed to compare the content of Dr. Bihl's treatment notes to his opinion."  (ECF Doc. 9, p. 13.) Neither argument is borne out by the record.  As to "supporting explanations," the ALJ explicitly highlighted Dr. Bihl's failure to cite to any "objective evidence . . . to support the extent of the limitations assessed."  (Tr. 24-25.)  And as to Dr. Bihl's treatment notes, the ALJ specifically summarized many of those records (Tr. 21-23) before finding "the record above does not establish foundation for or medical support for either of Dr. Bihl's allowances" (Tr. 25), those allowances being the reported need for rest and elevation of feet due to swelling and pain (Tr. 24).  The treatment records of Dr. Bihl summarized by the ALJ included:

- Visits from March and September 2016 which "showed complaints of neuropathy, although physical examination was entirely unremarkable," with "[m]edication management on a regimen including Gabapentin" (Tr. 21 (citing Tr. 260-68);

- A visit from November 2018 where Ms. Tuttle "ask[ed] for an increase in medication for neuropathy symptoms in the feet," "[p]hysical examination was entirely unremarkable," and she was "continued on Gabapentin" (Tr. 22 (citing Tr. 355-58));

- A visit from May 2019 where she "continued to endorse feet pain at bedtime," but "physical examination continued to show no significant findings" and her "regimen of Gabapentin and Cyclobenzaprine was unchanged" (id. (citing Tr. 347-48)); and

- A visit from May 2020 which where Ms. Tuttle's "[p]hysical examination was unremarkable" and there were "no changes" in her "Gabapentin and muscle relaxer regimen," and she was referred to podiatry "to evaluate a request for new orthotic inserts" (Tr. 22-23 (citing Tr. 322-25).

Dr. Bihl's records, as summarized by the ALJ, thus reflected that Ms. Tuttle complained of neuropathy symptoms in her feet over a period of years, but had consistently unremarkable clinical examinations and treated her symptoms with Gabapentin, muscle relaxers, and orthotics. Neither the ALJ's summary nor the records themselves included recommendations for Ms. Tuttle to rest or elevate her feet to alleviate swelling or pain from neuropathy.  It is therefore reasonable

to conclude that the ALJ was supported by substantial evidence when she found the records she previously summarized did not "establish foundation . . . or medical support for" requirements that Ms. Tuttle rest or elevate her feet due to pain or swelling caused by neuropathy.  (Tr. 25.)

Ms. Tuttle's arguments that "[t]he 'supporting explanations' [are] one-half of the required consideration under the supportability factor, and the supportability factor is not limited solely to objective findings" (ECF Doc. 9, p. 13) do not change this analysis.  The ALJ was required to consider supportability, and provided an adequate explanation of her analysis.  Regardless of whether the evidence highlighted by Ms. Tuttle might alternately support a finding that Dr. Bihl's opinion was supportable, this Court cannot overturn the ALJ's findings to the contrary "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  That is because "'[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).

Ms. Tuttle's argument that "it is unclear how the evidence does not support [Dr. Bihl's] opinion" because "the ALJ did not compare any of Dr. Bihl's treatment notes to his opinion" (ECF Doc. 9, p. 14) also does not change the analysis.  Given that the ALJ's summary of the records (accurately) reflects conservative treatment, no abnormal clinical findings, and no contemporaneous recommendations mirroring the limitations described in Dr. Bihl's 2023 medical opinion—which post-dates the relevant treatment notes by at least three years—the ALJ adequately explained her reasoning when she said the previously summarized treatment records failed to establish a "foundation" or "medical support" for the recommendations in Dr. Bihl's opinion.  Certainly, the ALJ was permitted to rely on information articulated earlier in a decision to support her findings, and was not required to rearticulate that information in her later analysis.

*See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Ms. Tuttle also argues that the ALJ inadequately addressed the "consistency" of Dr. Bihl's opinion—i.e., the extent to which Dr. Bihl's opinion findings are consistent with evidence from other medical and nonmedical sources in the record—because her general reference to a "review of the record above" did not explain "how Dr. Bihl's opinion is inconsistent with the record[.]"  (ECF doc. 9, p. 14.)  Ms. Tuttle acknowledges that Dr. Bihl's own treatment records "lacked objective findings," but argues that "the treatment notes of multiple specialists contain objective findings consistent with [her] symptoms and, ultimately, Dr. Bihl's assessment of limitations."  (*Id.* at p. 15.)  While Ms. Tuttle is correct that other treatment notes contained clinical findings consistent with neuropathy and decreased lower extremity sensation, the ALJ clearly summarized and acknowledged those findings before evaluating Dr. Bihl's opinion.  (*See* Tr. 21-23 (citing, e.g., Tr. 1688-89 (10/4/18, noting diminished sensation in both feet consistent with neuropathy); Tr. 577 (8/3/20, noting sensory deficit with loss of pinprick 8" above each ankle, inability to wiggle toes, and difficulty with tandem walk); & Tr. 546-49 (8/3/20 EMG finding "severe, symmetric, length-dependent, axonal, sensorimotor polyneuropathy").)  Having discussed those findings in detail earlier in her decision, the ALJ was not required to repeat the discussion in her opinion analysis.  *See Crum*, 660 F. App'x at 457.  The undersigned also does not find that additional explanation was needed to clarify the ALJ's finding that the previously summarized records did not establish a "foundation" or "medical support" for a recommendation that Mr. Tuttle elevate her feet to address pain and swelling.  While the records were consistent with neuropathic pain and decreased sensation, none of the records summarized by the ALJ or identified in Ms. Tuttle's brief contained recommendations or instructions to elevate her feet.

26

As with the supportability analysis, the question before this Court is not whether the evidence highlighted by Ms. Tuttle could support a finding that Dr. Bihl's opinion was consistent with other evidence in the record.  This Court cannot overturn the ALJ's findings to the contrary "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Here, it is evident that the ALJ considered the consistency of Dr. Bihl's opinion findings with other evidence in the record and provided an adequate explanation for her finding that those records did not provide a foundation or medical support for any requirement that Ms. Tuttle elevate her feet in the manner described in Dr. Bihl's opinion.

Thus, having reviewed the ALJ decision as a whole, the undersigned concludes that the ALJ articulated the basis for her persuasiveness findings in a manner that adequately explained how she considered the factors of "consistency" and "supportability," and that Ms. Tuttle has not shown that the ALJ's explanations or findings lacked the support of substantial evidence.

### 2. ALJ Properly Evaluated Plaintiff's Subjective Allegations

In her second argument, Ms. Tuttle acknowledges that the ALJ's written decision "provided reasons" for discounting her subjective complaints, but argues that the reasons the ALJ gave were "insufficient to explain why Plaintiff's allegations are unsupported."  (ECF Doc. 9, p. 17.)  The Commissioner responds that "[s]ubstantial evidence supports the ALJ's determination that Plaintiff's symptoms were not entirely consistent with the record," and more specifically the ALJ's finding "that the evidence did not support Plaintiff's testimony about having to elevate her feet to waist level."  (ECF Doc. 12, p. 8.)

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-

3p, 82 Fed Reg. 49462, 49463 (Oct. 25, 2017); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  Relevant factors included daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).

Here, the ALJ considered Ms. Tuttle's subjective allegations and concluded that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but nevertheless found her "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 23-24.)  In support of this finding, the ALJ explained:

> Regarding the claimant's medical conditions, the record reflects a history of Marfan's syndrome diagnosed in childhood. Records during the period at issue reflected treatment for osteoarthritis and plantar fasciitis, with symptoms of bilaterally lower extremity peripheral neuropathy. Despite the claimant's subjective reports, records during the period at issue show consistently conservative treatment in the form of medication management and prescribed orthotic shoe inserts for pain. Despite notations of diminished sensation to light touch in the bilateral feet in a stocking pattern, the majority of physical examinations during the period at issue were unremarkable with respect to any significant findings. At no time did the claimant require inpatient hospitalization or surgical intervention for any of her alleged impairments. The record did not support the extent of the claimant's alleged sitting, standing, or walking restrictions as noted during testimony, reported of the extent of leg elevation as noted during testimony, or difficulties with lifting. There is no indication that the claimant has required any assistive devices of any type for balance or ambulation, and no significant side effects from medications. Therefore, after consideration of the medical evidence of record during the period at issue, the undersigned has found the claimant capable of sedentary work with the claimant able to occasionally operate foot controls with the bilateral lower extremities; can never climb ladders, ramps, or stairs; occasionally climb ramps and stairs, and occasionally balance as that term is defined in the *Dictionary of Occupational Titles*

(DOT); can occasionally stoop, kneel, crouch, and crawl; must avoid exposure to all hazards, including unprotected heights, dangerous machinery, and those requiring use of foot controls.

(Tr. 24.)

Ms. Tuttle argues that the ALJ's explanation was inadequate because she: (1) failed to explain how "conservative treatment" was inconsistent with the allegations; (2) failed to explain how clinical findings of reduced sensation were inconsistent with the allegations; and (3) discussed the need for an assistive device when Ms. Tuttle did not allege that she needed an assistive device.  (ECF Doc. 9, pp. 19-22.)  These arguments will be addressed in turn.

In her first argument, Ms. Tuttle draws an analogy between Ms. Tuttle's neuropathy and cases involving the treatment of fibromyalgia, arguing it is irrelevant that her treatment did not involve "inpatient hospitalization or surgical intervention" because "[i]t is unclear how Plaintiff could treat more aggressively for her severe impairments."  (*Id.* at p. 19.)  But she also asserts that she later received "surgery for 'the drop foot from the neuropathy'" after the expiration of her date last insured.  (*Id.* at p. 20 (citing Tr. 43).)  The regulations advise that one factor to be considered in evaluating the intensity, persistence, and limiting effects of a person's symptoms is "[t]reatment, other than medication, an individual receives or has received for relief of pain or other symptoms."  SSR 16-3p, 82 FR at 49466; *see* 20 C.F.R. § 404.1529(c)(3)(v).  Thus, it was wholly appropriate for the ALJ to observe—among other factors—that "records during the period at issue show consistently conservative treatment in the form of medication management and prescribed orthotic shoe inserts for pain," and that "[a]t no time did the claimant require inpatient hospitalization or surgical intervention for any of her alleged impairments."  (Tr. 24.)

In her second argument, Ms. Tuttle challenges the ALJ's observation that: "Despite notations of diminished sensation to light touch in the bilateral feet in a stocking pattern, the

majority of physical examinations during the period at issue were unremarkable with respect to any significant findings."  (Tr. 24.)  Specifically, she argues that the ALJ failed to explain how the clinical findings of diminished sensation were inconsistent with Ms. Tuttle's subjective allegations (ECF Doc. 9, p. 20), and also that it was "inaccurate" for the ALJ to say "the majority of physical examination during the period at issue were unremarkable with respect to any significant findings" (*id.* at p. 21 (quoting Tr. 24)).

As to the first issue, the ALJ acknowledged that Ms. Tuttle alleged she could stand or walk for 30 minutes and sit for 30 minutes without elevating her legs, and that she kept her feet elevated 5-6 times per day, for 30 minutes to two hours each time.  (Tr. 21.)  The ALJ then concluded, after outlining the medical records (Tr. 21-23), that Ms. Tuttle's conservative treatment with medications and orthotics, with clinical findings of reduced sensation but otherwise largely unremarkable findings, was inconsistent with the significant standing, walking, sitting, and leg-elevation limitations alleged by Ms. Tuttle (Tr. 24).  The ALJ adequately explained why the balance of factors did not support Ms. Tuttle's alleged level of limitation.

As to the second issue, Ms. Tuttle has failed to show that the ALJ was "inaccurate" or otherwise mischaracterized the evidence when she said the "majority of physical examination findings . . . were unremarkable."  (Tr. 24.)  While Ms. Tuttle highlights abnormal findings from a few examinations and an EMG in 2020 (*see* ECF Doc. 9, p. 21 (citing Tr. 576-78 (8/3/20 exam), 590 (6/2/20 exam), 278 (6/11/20 PT evaluation), 546-51 (8/13/20 EMG))), the ALJ acknowledged those and other abnormal examination findings, but also identified numerous examinations between 2016 and 2020 where the findings were unremarkable (Tr. 21-23).  Further, even those examinations with some abnormal findings—such as the October 2018 exam that noted diminished sensation to light touch in the bilateral feet, downgoing plantar responses,

30

and mildly positive hip and SI joint provocative tests (Tr. 1689)—could be reasonably described as having a "majority of physical examination findings" that were unremarkable (Tr. 24), like normal lower extremity pulses, reflexes, and strength, and negative SLR and Spurling's tests (Tr. 1689).  The ALJ's characterization of the "majority of physical examination findings" as "unremarkable" thus did not amount to a misrepresentation of the evidentiary record.

In her final argument, Ms. Tuttle asserts that the ALJ relied on "irrelevant or factually unsupported" reasons when she found: "There is no indication that the claimant has required any assistive devices of any type for balance or ambulation."  (ECF Doc. 9, p. 22 (quoting Tr. 24).) Since Ms. Tuttle did not allege that she used an assistive device, she asserts that this observation did not "identify an inconsistency in the record."  (*Id.*)  But the ALJ observed that Ms. Tuttle did allege she could only stand or walk for 30 minutes.  (Tr. 21.)  The regulations advise that other factors to be considered in evaluating the intensity, persistence, and limiting effects of a person's symptoms include: "[a]ny other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms."  SSR 16-3p, 82 FR at 49466; *see* 20 C.F.R. § 404.1529(c)(3)(vii).  Whether an individual who alleges that she could not stand or walk longer than 30 minutes used an assistive device to help with standing or walking was an appropriate consideration.  Thus, it was not improper for the ALJ to consider whether Ms. Tuttle used or required the use of an assistive device when assessing Ms. Tuttle's subjective allegations.

Consistent with the regulations, the ALJ explicitly considered Ms. Tuttle's medical diagnoses, conservative treatment modalities, objective medical findings, and other factors relevant her functional limitations before concluding that her subjective allegations were "not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 24.) Nevertheless, the ALJ adopted a restrictive sedentary RFC with additional limitations in the use

31

of foot controls, climbing, postural positions, and exposure to hazards. (*Id.*) In this context, the undersigned finds Ms. Tuttle has not met her burden to show that the ALJ's analysis of her subjective complaints failed to meet the regulatory standards. Instead, the ALJ weighed all of the evidence, credited Ms. Tuttle's subjective allegations to the extent she found them supported by the record, and limited her to a sedentary RFC with additional limitations.

Having reviewed the ALJ decision as a whole, the undersigned concludes that the ALJ considered the subjective allegations in the context of the record as a whole and adequately articulated the basis for her related findings, and further that Ms. Tuttle has not shown that the ALJ's explanations or findings lacked the support of substantial evidence.

### 3.     The RFC Finding is Supported by Substantial Evidence

In a cursory third argument, Ms. Tuttle asserts that the ALJ failed to adequately explain the basis for her RFC limitations when she found the medical opinions of the state agency medical consultants "unpersuasive" and adopted an RFC with "greater functional limitation[s]." (ECF Doc. 9, pp. 22-23 (quoting Tr. 24).)[4]

A claimant's "residual functional capacity is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing See 20 C.F.R. §§ 404.1546(c), 416.946(c)). An ALJ assesses a claimant's "residual functional capacity based on all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1). "[A]n ALJ does not improperly assume the role

---

[4] To the extent Ms. Tuttle also intended to argue that a medical expert was needed to interpret "raw medical data" in this case (ECF Doc. 9, p. 23), the undersigned finds the argument is underdeveloped and therefore waived. *See McPherson*, 125 F.3d at 995-96.

of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe*, 342 F. App'x at 157.

Here, the ALJ found Ms. Tuttle had the RFC to perform sedentary work with the following additional limitations: occasionally operate foot controls with the bilateral lower extremities; can never climb ladders, ramps, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; must avoid exposure to all hazards, including unprotected heights, dangerous machinery, and machinery requiring use of foot controls in general.[5] (Tr. 20.)

> When addressing the state agency medical consultant opinions, the ALJ explained:
>
> The undersigned has considered the State agency medical consultant's opinions which initially found the claimant limited to a reduced range of light exertion work; 4-hours standing and/or walking; occasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; and avoiding all exposure to hazards including no hazardous heights, and operating hazardous machinery requiring use of foot controls []. This assessment was affirmed on reconsideration []. The undersigned has found these assessments <u>unpersuasive</u>. <u>Given the claimant's continued complaints of peripheral neuropathy and underlying musculoskeletal concerns, as well as nerve conduction findings in 2020 which showed severe, symmetric, length-dependent, axonal, sensorimotor polyneuropathy [], the undersigned has found greater functional limitation warranted as reflected in the residual functional capacity articulated above.</u>

(Tr. 24 (emphasis added) (internal citations omitted).) Thus, while the ALJ adopted most of the RFC limitations recommended by the state agency medical consultants, she reduced the RFC from light exertional work (with a limitation to four hours of standing or walking) to sedentary exertional work (which requires no more than two hours of standing and walking) in light of Ms. Tuttle's "continued complaints of peripheral neuropathy," her "underlying musculoskeletal

---

[5] Ms. Tuttle's briefing inaccurately characterizes the RFC as a limitation to "medium work" (ECF Doc. 9, p. 9), when the ALJ actually limited her to the performance of "sedentary work" (Tr. 20). It is unclear whether Ms. Tuttle's inaccurate understanding of the RFC's exertional level plays any role in the arguments she raises here.

concerns," and her recent EMG findings showing "severe" polyneuropathy.  Thus, the ALJ clearly explained her reasons for adopting the exertional requirements in the final RFC.

To the extent Ms. Tuttle seeks to argue that the ALJ erred because she should have adopted an even more restrictive RFC—one containing the need to elevate feet to waist level multiple times throughout the day—it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  While Ms. Tuttle contends that her abilities are more limited than the sedentary RFC formulated by the ALJ, she has failed to show that the ALJ lacked substantial evidence to support her RFC findings.

Accordingly, the undersigned finds Ms. Tuttle's sole assignment of error is without merit.

### VII.    Recommendation

The undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

June 23, 2025

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).